Alfredo Negrón, Plaintiff and Appellee, *v.* Heirs of Dr. Eladio María Izquierdo Serrano, Defendants and Appellants.

No. 6192. Argued February 2, 1934.—Decided May 4, 1934.

R. *Rivera Zayas* for appellants. R. *Buscaglia* for plaintiff.

Mr. Justice Córdova Dávila delivered the opinion of the court.

This is a filiation suit whereby Alfredo Negrón seeks to be declared a natural son of Dr. Eladio María Izquierdo Serrano. The complaint alleges that Dr. Izquierdo died in Morovis, Puerto Rico, on October 10, 1931; that the plaintiff Alfredo Negrón was born on August 3, 1903, in the town of Toa Alta, Puerto Rico, and that he is a natural son of Nicomedes Negrón and of Dr. Eladio María Izquierdo Serrano; that during the pregnancy and at the time of his birth, his mother, Nicomedes Negrón, lived in concubinage with Eladio María Izquierdo Serrano; that since the birth of the plaintiff, Dr. Izquierdo had him under his care and protection, having called him "son" publicly and in the presence of his friends and having looked after his maintenance, support, education, and welfare; that during the pregnancy and at the time of plaintiff's birth, his parents, the aforesaid Nicomedes Negrón and Eladio María Izquierdo

Serrano, were single, there being no family relationship between them or any other legal impediment preventing their contracting marriage, with or without dispensation.

The defendants admit that at the time of the conception or birth of the plaintiff, Nicomedes Negrón and Eladio María Izquierdo Serrano were single, and were not related to each other, but deny that no legal impediment existed preventing their contracting marriage, with or without dispensation, or in any other manner, for during the time to which the complaint refers, Dr. Izquierdo was a Catholic Priest, actively engaged in the exercise of his ministerial office. Further, denial is made of the averments of the complaint, and it is alleged that the same does not state facts sufficient to constitute a cause of action.

The lower court rendered judgment declaring Alfredo Negrón to be an acknowledged natural son of Eladio María Izquierdo Serrano, with all the rights pertaining to his filiation. The first assignment of error is that the lower court erred in overruling the demurrer for lack of facts sufficient to constitute a cause of action. The defendants based this demurrer on the ground that the complaint did not state a single fact, and that the plaintiff had simply transcribed the provisions of the Revised Civil Code with regard to the cases in which the father is obliged to acknowledge a natural child.

This is a question which has already been decided by this court, in passing over demurrers for insufficiency in suits for filiation, where the averments of the complaint were more or less similar to those which gave rise to the demurrer of the defendants herein.

In *Ramos* v. *Succession of Cabán,* 18 P.R.R. 515, it was alleged that Juan Tomás Cabán, in his amorous relations with María Ramos, had procreated the plaintiff, Prudencio Ramos, who publicly and privately was always considered by his father, Juan Tomás Cabán, as his child; and that at the time the plaintiff was conceived or born, his parents were

single and in a position to contract marriage. Referring to those allegations the court said:

"These facts constitute the essential allegations that must be proven in a case of this nature. The various acts performed by the father indicating acknowledgment should have been, and were, the object of the evidence during the trial, such evidence, moreover, having been taken without any opposition by the adverse party."

In *Vega* v. *Heirs of Vega*, 32 P.R.R. 548, the complaint alleged that the plaintiff was a daughter of Laó Vega and of Venancio Vega, who maintained amorous relations as a result of which the plaintiff was born on July 25, 1899; that Venancio Vega publicly visited the house of Laó Vega daily and supported her; that since the plaintiff's birth her father protected and supported her, called her his daughter publicly and in the presence of his friends and acted towards her as a father uninterruptedly, until his death, and that at the time of the conception or birth of the plaintiff her parents were single and qualified to contract marriage. This court held that although the complaint could in fact have been more specific, it could not be concluded that it failed to allege facts sufficient to establish the status of a recognized natural daughter. We say the same in this case, and must add that evidence was adduced with regard to the various acts exercised by the father and his family showing an acknowledgment, without any objection on the part of the defendants. The first assignment of error must be overruled.

In the second assignment it is maintained that the court erred and was moved by prejudice and partiality in weighing the testimony of the witnesses, whom it gave credence despite the inconsistent manner in which they testified, and in considering as acts of acknowledgment those stated by the witnesses to have been performed by the alleged natural father, the evidence with regard to these acts not showing a clear and express intention to acknowledge the child and said evidence not being strong and convincing. It is urged that the acts erroneously considered by the court, with bias

and prejudice, as involving an acknowledgment, consisted principally in the alleged natural father calling the plaintiff "son" on some occasions; and in certain acts of assistance which, under the circumstances of this case, should not be considered as anything more than indications of interest and generosity, being entirely foreign to any acknowledgment.

The lower court, in its findings of fact, referring to the testimonial evidence introduced by the plaintiff, says:

"From the evidence adduced by the plaintiff it appears that in the year 1903 Nicomedes Negrón was the servant of Doña Manuela Serrano, mother of Dr. Eladio Izquierdo Serrano, in the town of Toa Alta; that Dr. Izquierdo was a Catholic Priest at the time and resided in his Parish of Toa Baja; that twice a week he went to Toa Alta to visit his mother and slept there; that during his stays in the home of doña Manuela, he had carnal intercourse with the said Nicomedes Negrón, and that the latter became pregnant; that when Doña Manuela Serrano noticed the servant's condition, she asked her with whom she had had sexual relations and she answered that with Doña Manuela's son, and that then the servant was discharged from the house of Doña Manuela; that thereafter Dr. Izquierdo rented a house belonging to Elvira Martínez, situated on Mango Street of Toa Alta, and he took Nicomedes Negrón there, visited her every afternoon, and slept there at night, returning in the morning to Toa Baja; that Dr. Izquierdo paid for all her maintenance expenses; that in this situation, on December 16, 1903, Nicomedes Negrón gave birth to a boy who was named Alfredo and was registered in the Civil Register as the natural son of Nicomedes Negrón; that Dr. Izquierdo paid for all the expenses of Nicomedes and her son; that forty days after the child was born, Dr. Izquierdo sent Nicomedes Negrón with her child to the house of her father, who resided in the country, gave her a milch cow for feeding the child and told her to place the child later in the care of Doña Manuela Serrano; that when the child was two years old, he was delivered to Doña Manuela Serrano, with whom he lived until he was a young man; that during those two years all the expenses for maintenance and support of the child were paid by Dr. Izquierdo; that while the child was under the custody of Doña Manuela, Dr. Izquierdo left for the United States in order to pursue other academic studies and came back when Alfredo was ten or twelve years old, and that since then he continued to supply person-

ally all the needs of the minor, and called him his son publicly and privately; that Alfredo married in 1925 and Dr. Izquierdo leased a rural property in order that Alfredo might reside there and manage it for his own benefit; and it thus happened that Dr. Izquierdo went to visit him there and in the presence of witnesses called him 'son'; that owing to the fact that the business venture was not successful, Dr. Izquierdo sent him then to Santo Domingo giving him money for the trip, from which Alfredo subsequently returned by reason of a cyclone and received immediate help from Dr. Izquierdo; and that on a certain occasion both lived together in Cataño, as father and son.

"'All those facts appear from the testimony given by Nicomedes Negrón, Pedro Rivera, Carlos Rivera, Cándido Santiago, Simplicio Santiago, Angel Ortega, and Alfredo Negrón, wherein other details and circumstances are set forth. They were not contradicted in any way. A witness is presumed to speak the truth. This presumption, however, may be overcome or destroyed by the manner in which he testifies, by the character of his testimony, by evidence affecting his honesty, or motives, or by contradictory evidence. There is nothing here tending to destroy that presumption.

"The only evidence introduced by the defendants is that tending to establish the fact, not denied but on the contrary admitted by the plaintiff, that Dr. Izquierdo at the time of the conception or birth of the child was a Catholic Priest.''

The defendants maintain that the evidence introduced herein failed to show that Dr. Eladio María Izquierdo had the intention of acknowledging, or that he acknowledged, Alfredo Negrón as his natural son. It is added that, in accordance with the adjudicated cases, it is not enough that a person should perform some or many acts of kindness, tenderness, protection, or interest towards another in order to justify the inference of acknowledged paternity; something which is in itself so grave and of such importance to the peace, order, and resources of the family.

Section 189 of the Revised Civil Code, in force at the time the plaintiff was born, reads in its pertinent part as follows:

"A father is obliged to recognize his illegitimate child in the following cases: ...

"1.     *     *     *     *     *     *  ·  *

"2. When publicly or privately he has shown that it is his child, or has called it as such in conversation, or looks after its education and maintenance.

"3. When the mother was known to have lived in concubinage with the father during the pregnancy or birth of the child, or when the child was born while his parents were engaged to be married, (*relaciones amorosas*)."

The lower court discarded the theory of a concubinage, as the same had not been proved, and rendered judgment on the basis of subdivision 2 of the above-quoted section. The findings of the court below are supported by clear and abundant evidence. "Since the day Alfredo Negrón was born," says the trial court, "his father proceeded to establish his legal status, by calling him his child publicly and privately, by speaking of him as such child in his conversations, and by looking after his support." "These acts which are more than isolated occurrences," the court goes on to say, "constitute an uninterrupted series of relations between father and son. When that is shown, the status of a natural child may be decreed."

The defendants in their brief analyze the evidence adduced and attempt to discredit the testimony of the various witnesses. Such testimony was not controverted. The court below says that the same is convincing and we so hold. The acts performed by Dr. Izquierdo are in themselves sufficient to establish the allegations of the complaint. To these acts must be added the conduct of Dr. Izquierdo's mother towards the plaintiff, receiving him in her home, where he lived until he reached manhood. We have examined the evidence in all its details and must state that each and every one of the findings of fact made by the trial judge are justified by the evidence. The latter has been weighed correctly and dispassionately and not with bias or prejudice, as claimed by the defendants. It may be that some witness has incurred in

exaggerations; but the evidence as a whole impresses us as being true, and it is convincing, as stated by the district court.

It is finally urged that the court erred in holding that the plaintiff possessed all the qualifications required by the law in force at the time of his birth, to have the status of a natural child, capable of being acknowledged, for taking into account the fact that the putative father was a priest, and marriage being an institution originating in a contract, such contract would be absolutely void under our existing laws.

The defendants in their brief argue that prior to the enactment of the Revised Civil Code, there existed a prohibition against the marriage of any person who was bound by a solemn religious pledge of chastity, and then say:

"With the advent of Anglo-American institutions, the Revised Civil Code leaves out that prohibition, but what it has been unable to eliminate from the Puerto Rican spirit, from the belief and tradition of the Puerto Rican society, which is entirely catholic, is the postulate of public policy that a Catholic Priest, by reason of his sacred ministry and the solemnity of his vows of chastity, can not by any means contract marriage, at least while he is in the active exercise of his ministry.

"And this last aspect of the question raises an interesting problem of civil law. Under our code, marriage is a civil institution, originating in a civil contract and in accordance with the same code no contract which offends or contravenes public policy or morality can be valid, and if public policy in our society is opposed to the marriage of Catholic Priests, if this question is viewed from the standpoint of the law of contracts, it could be maintained that the marriage of a Catholic Priest in the active exercise of his ministry is contrary to public policy and hence void."

In deciding the question thus raised by the defendants, Judge Samalea Iglesias in his statement of the case and opinion says:

"The reasoning of the defendants, which deserves our utmost respect, can not, at the time of deciding the question involved herein, which must necessarily be determined in the light of our statutory

provisions, avoid the clear consequences of a civil status expressly sanctioned, acknowledged, and protected by the law.

"The law does not say that any religious vows taken by a person are a legal impediment to his contracting marriage; and we can not supply that silence of the civil law by incorporating therein an adequate provision. An old legal maxim is applicable herein: 'Expressio unius est exclusio alterius.' Up to 1902, a person who was a member of an approved religious order could not contract marriage, because it was so provided by law; but since the enactment of the Revised Civil Code, such prohibition has ceased to exist, and hence a child born out of wedlock, may demand his acknowledgment even though one of his parents should be a member of a religious order. Illegitimacy disappeared by reason of the sacrilegious character of the intercourse from our legal institutions in harmony with prevailing ideas in modern legislation. The characterization of a child as sacrilegious today is to us simply a thing of the past. The ordinary clergyman, the one that joins the church bound by the three solemn pledges of poverty, obedience, and chastity, is not prevented by our laws from contracting marriage. Such marriage may be contrary to the canons of the Catholic Church but not to our laws. The only reason that might induce one to reject the claim of acknowledgment arises, therefore, from other considerations than those based on the civil law of Puerto Rico. A priest, who disregarding the mandate of the church breaks his pledge of chastity and procreates a child, may have violated his duties, but our civil law principles do not allow that such a violation by itself should operate to destroy the right of the child to demand his legitimation and to dissolve the relationship created.

"In the absence of some principle of constitutional or statutory law, of public policy, or the like, parties may make any contract that they choose. *Clausells* v. *Commercial*, 37 P. R. R. 110. The defendant succession attacks the capacity of the parents of the plaintiff to enter into a contract of marriage by reason of the religious vows of the father, based on philosophical principles of public policy and morality, and accordingly invoke section 1222 of the Civil Code.

"It is true that said section prohibits contracts which are contrary to law, morals, or public order. But we see no legal reason why a contract of marriage should not be lawful, in so far as morals and public order are concerned, because one of the parties is a member of an approved religious order.. Such a contract has none of the objections referred to in the cited section. The law, in referring

to morals, means those moral principles or precepts which are not questioned but generally admitted. With these, the law is not necessarily concerned, they pertain to the field of private and social duties. And the public order to which the law refers is that represented by public, social, and legal interest within the private law.

"We fully appreciate the solemnity of a pledge such as that given to the Church by the learned men who are invested with an ecclesiastical dignity; but this can not prevent a court of justice from acknowledging the natural and probable consequences of their acts . . ."

The judgment appealed from must be affirmed.